Good morning, Steve Hormel on behalf of Mr. Seideman. This matter comes to the court on a second-degree murder conviction, an alleged incident that occurred in the Colville, Confederated Tribes of the Colville Indian Reservation in eastern Washington. My client, Ryan Seideman, was convicted of second-degree murder after the first-degree murder allegation was found. The main thrust of the appeal focuses primarily on the sufficiency of evidence and evidence that was excluded during the course of trial. There's also issues relating to the district court's failure to grant a new trial after a material witness was located that couldn't be located prior to the trial. To begin with, I'll start with the sufficiency of evidence argument. In this DNA evidence, two statements that were given by Mr. Seideman, one the day after his arrest and one almost two years after his arrest, that the government claims were inconsistent and showing a consciousness of guilt. Basically, there were four pieces of evidence that the DNA lab tested, the FBI lab tested. One was a knife that the government claimed was a murder weapon, and the knife came back with DNA on it. It was only the DNA of Ms. Lee, the deceased. No DNA of Mr. Seideman was found. There was no tool mark expertise or any testimony connecting that knife to Ms. Lee or as the murder weapon. More importantly, there was no evidence that connected that knife to Mr. Seideman. The second piece of evidence was a condom that was found in the bathroom sink. The importance of the condom is that the government's claim throughout the trial was that condom was somehow connected to the homicide, when in fact there was no DNA of Ms. Lee on that condom. In fact, she was completely excluded as being a contributor DNA on that condom. The next piece of evidence that the government was relying on was a pair of underwear that was found in a bag of clothing in a pasture behind Ms. Lee's residence. The only piece of clothing that was tested or submitted to or tested by the FBI lab was a pair of underwear at the behest of the FBI agent involved in the case. The interesting part of the DNA on the underwear is that it shows there's at least four contributors of DNA on the underwear. One was Ryan Seideman on a small spot on the left leg of the underwear. One was confirmed Ms. Lee on two areas, two stains in the underwear or two areas in the underwear. One was the waistband and one was the stain. The area that had a stain that contained Ms. Lee's underwear had profiles of at least two other individuals. Mr. Seideman was excluded. So there's at least two other individuals that contributed to DNA on that underwear. There's a third stain where Ms. Lee could not be excluded as a contributor or at least one other person was on that DNA profile was on that underwear. Mr. Seideman's DNA profile could not be excluded from the waistband of the underwear, is that correct? As a minor potential contributor, that is correct. And there was also on the waistband another profile that could not be identified as belonging to anybody also. So there's at least two and other potential contributors of DNA on that underwear. Ms. Lee's blood was not confirmed on that underwear. This was a, as the pictures show and as the evidence showed at trial, was a prolonged violent battle with blood splatter or spatter, excuse me, everywhere in the apartment. Blood all over the floor, blood in the kitchen area, blood in the dining area, blood in the living area where Ms. Lee was actually found. There was no blood DNA of Ms. Lee on Mr. Seideman's underwear. The only blood stain, the only blood that was there was Mr. Seideman's blood in a tiny spot that was taken from the left leg. Was there any evidence of Ms. Lee's blood on any of the items found in the plastic bag? No, in fact, well the only evidence in relation to the items found in the plastic bag was FBI analyst Rolando who said the reason they didn't test the other items was because the underwear would be the most intimate part of the clothing that somebody would be wearing. So the conclusion that the lab draws is whoever was the last wearer of the underwear would have been the last wearer of the items of clothing. What was interesting about the clothing other than the underwear is none of that clothing had been subjected to lab testing. And there's the other issue deals with the chain of custody as to whether or not that clothing should have been admitted at all at trial because lab analyst Rolando indicated that there were no lab markings on that clothing and she could not identify that clothing as having been at the FBI lab for testing, even though that was the claim of the government. I'm a little puzzled about the items in the plastic bag. There seems to be different information as to what is in the plastic bag at a different given time. I note that in the November 2006 inventory, the list included a belt, a lighter, a sock, a rag, and a black tank top. But there's no mention of a buckle or pants or underwear. And that was that in the November with the handwritten notes in it, Your Honor? Are you referring to the... I'm referring to the November 2006 inventory list. That has the handwritten notes in it. There's two inventory lists that I believe are important. And one is the April 18th inventory list, which indicates that there was a, I believe a pair of pants, but doesn't doesn't list a black tank top, doesn't list the belt or the buckle, doesn't list a sock, doesn't list a lighter. And then in November of 2006, handwritten by one of the FBI lab personnel, our additional lists that they indicate came from the bag. There's no indication from the lab as to how the list of April 18th was all of a sudden modified to include additional items of clothing that weren't seen in the ECU unit, the evidence collection unit in the FBI. In fact, the FBI collection unit noted that there was a belt to have been the items that they located, they opened the bag and could not verify its contents. So there's a real question as to what actually was sent to the FBI lab and how the evidence was handled. And that's why we raised the chain of evidence objection at trial. And the the key that I believe was important in the lab analyst Rolando's testimony was that there were no FBI markings on any of that additional evidence to show that the FBI actually received those items of clothing. The only evidence of markings was from employee Mr. Hammer, who was an employee in Spokane, who said he recognized the items because they had FBI markings on them. Well, it's obvious they didn't have FBI markings on it because the FBI employer herself said there were no FBI markings on it. So and there was no evidence offered by the government to show what Agent Hammer was actually believing was markings, were markings. I mean the evidence was absolutely lacking as to the authenticity or the chain of evidence on those pieces of evidence. Didn't Mr. Scheidemann state or assert that he was not there? He said he was at, he confirmed in both statements that he was at Ms. He said he handwritten into a statement, I thought I was there Friday because they asked him where were you Saturday and Sunday. He indicated he indicated at first he was there but then he wrote in, I thought I was there Friday. So he's not denying that he was there, he just thought it was Friday. And he denied having any sexual relations or contact with the victim? He did. Okay. In fact, there's no evidence that he did in this trial have sexual contact with this victim. It says the presence of Mr. Scheidemann's condom in the bathroom sink at Mr. Lee's, at Ms. Lee's house and then Ms. Lee's body was laid on top of a half-broken condom wrapper with the other half laying next to her. Does that not place him at the crime scene and is there a reasonable inference based on that that he would have had or could have had sexual relations with her? I think the reasonable inference you can draw from that evidence, Your Honor, is that the condom may be associated with the condom wrappers, maybe. The lab never did testify or never did test the condom wrappers or have it or try to connect any link. But to then turn that into an inference that was actually excluded as any potential contributor on that, it's exactly. But then we don't, we have Mr. Scheidemann's DNA profile. I mean, you may have stated this right now, was also part of a blood mixture on the victim's sweatshirt that was on her body. Could not be excluded as a potential contributor. Right. Of a blood mixture on a one-centimeter sample on the cuff of her sweatshirt or left on that was not on her body, but it was removed or excuse me, it was on her body, excuse me, at the time she was found. And the underwear that was found with the other clothing in the bag behind Ms. Lee's apartment, was that a men's underwear, woman's underwear? It wasn't clear to me. Actually, it's in the serological testing. It's blue underwear. It's a boxer type underwear. And that's why on, you know, Myra LaRocque's cross-examination, I brought out the fact that Ms. Lee wears men's boxer underwear, because that ties her into having worn that underwear or the, that's why her DNA would be on the waistband of the underwears, because it wasn't uncommon for her to wear a boxer underwear. And that contained both Mr. Scheidemann's and Ms. Lee's DNA, including blood belonging to Mr. Scheidemann, correct? The tiniest spot of blood on the left, right leg, yes, Your Honor. And Mr. Scheidemann at first did not, was, was it, is it correct that the FBI did not see any wound on Mr. Scheidemann? Correct. But then the second time that Mr. Scheidemann gave a statement, he then indicated he did have a cut on his hand? Two years after the incident, yes, Your Honor. He, he said that in a statement. Who knows how the questioning went with the FBI at the time, but I think the key is, is that Detective Anderson knew that this was a violent homicide, knew that there was a tremendous struggle, did not notice anything to indicate any struggle on Mr. Scheidemann the day after the incident. Is there evidence that he examined his hands? The evidence is he didn't notice anything on his hands, no. The government didn't clarify that. The status of the evidence is, is there was no indication. And, and, and to, just to address the, the, what would appear to be, or what the government argues are conflicting statements by Mr. Scheidemann, and that is, is that the Juan H. case versus Allen indicates that inconsistent statements or, or false statements to a police officer aren't sufficient, doesn't raise sufficient inferences of guilt to get beyond the sufficiency of evidence standards. So in a legal aspect, the, if, if the statements are determined to be inconsistent in a couple of areas, that, that does, that doesn't lead to the reasonable inference of guilt by Mr. Scheidemann. The, the, the underwear is the, is a very interesting piece of evidence because I think it's a red herring in this case. Because Mr. Scheidemann was not excluded as a minor potential contributor, which means he, there wasn't a sufficient amount of DNA on that waistband to determine that he, his DNA profile was in fact on that waistband. But Ms. Lee was found to be a major contributor of the DNA. So we know that Mr. Scheidemann was at her residence at 5 o'clock in the morning Saturday, March 18th. So in order for Ms., and we know that perhaps there was something of a sexual nature going on in Ms. Lee's residence at that time because there is a condom that's found in her residence with his, only his DNA on it. So the reasonable inference you draw from that fact is that Ms. Lee put that, that pair of underwear on after Mr. Scheidemann had left the, the residence. That's how she became the major contributor of DNA on the waistband. It doesn't connect Mr. Scheidemann to a homicide. There's no blood DNA whatsoever from Ms. Lee on that underwear. This was a bloody, the apartment was a bloody mess. If that underwear had any connection to the homicide, there would be blood all over it. What was found on it was feces, and who knows how the feces got on the underwear. Did they test whose feces that was? What's that? Did they test the feces? There was evidence, there was evidence that when they opened the bag, it smelled of feces. And there was, and there was, there was, there was brown spot. I'm not sure if the lab ever tested it for feces, but they certainly didn't test it for blood. And we do know there was a strong odor of feces coming out of that bag. But there's no evidence of, that it was tested? No. Can you turn your attention to your argument regarding the Brooks testimony? Yes. Mr. Brooks was a key witness to the defense. Even the district court said during the trial that it was critical piece of evidence. Because we could not locate Mr. Brooks to subpoena him, and then the marshals couldn't locate him to serve a material witness warrant, the court allowed us to bring in Mr. Brooks' statements of his observations of August Jolly, the day that Ms. Lee was found dead. And August Jolly was a close friend and panhandler of Ms. Lee, who indicated he had been with Ms. Lee over the weekend. So what the judge permitted us to do is we couldn't admit it as substantive evidence of what Mr. Brooks saw, but we could impeach the investigation for not having looked further into August Jolly as the suspect, because he was seen outside, he was reported to have been seen outside of Ms. Lee's apartment complex area, with blood on his pants, a scratch on his face, swollen knuckles, drinking a beer, and exclaiming that life was fucked up. And that was the condition that Brooks saw August Jolly in. So what is your argument as to how you would have gotten Mr. Brooks' statement regarding what he heard Mr. Jolly and the other individual speaking about? I think you said in your papers that you wanted to get it admitted based on a declaration against interest. Yes. First of all, we weren't allowed to get the observations of Mr. Brooks in as substantive evidence. It was for their truth. The only way we can get that in is if we can get Mr. Brooks there, and either he has a recollection of it or we get it in under past recollection recorded. The same is true with the statement against penal interest. And the statement against penal interest, the reason that the judge said this wasn't against penal interest, the main thrust was because Brooks made the general reference to they were talking about destroying clothing and shoes to avoid prosecution. Well, also, you have to look at Brooks' statement. Brooks making the statement about what he heard others say would not be against Brooks' penal interest. No, it would not. It would have to come in under, there's double hearsay is admissible if it's admissible under any theory. So the admissibility of his hearsay statement, of Brooks' hearsay statement, is admissible as a past recollection recorded. So what he overheard would be admissible as a statement against penal interest. So even though it's double hearsay, it's admissible because it's admissible under individual theories of hearsay. Mr. Hormel? Yes, yes. I wonder if I could ask you a question about that, please. Let's assume you're right that the judge was wrong, that it could have somehow come in as newly discovered evidence, and that it could have come in under some exceptions to the hearsay rule. He said even so, in his opinion, having heard all the evidence, it wouldn't have likely led to an acquittal. What's your answer to that? Your Honor, this jury was out for almost two days on a trial whose evidence was about four days long. And there were ñ it was obvious that there were questions about Mr. Seidemann's guilt. And what the jury got to hear was Brooks saying these things, but never got to see Brooks or bring this evidence in as substantive evidence of August Jolly being the third suspect. And what ñ Well, if they would have brought him in, wouldn't he have said, I don't remember? Correct. So how would that have helped? He would have identified his signature, and he would have identified the fact that it was signed under penalty of perjury. A lack of memory doesn't mean what he wrote down is not credible. A lack of memory just means he doesn't remember. The government, with Mr. Brooks there, then would be able to bring in impeachment. But the reason that he doesn't ñ But he would have to say, wouldn't he? He would have to say, not only is that my signature, but it was true when I wrote it. Correct. And we anticipate that. Now, do we have any reason to believe he would say that? I believe in my affidavit, in my affidavit to the judge when I asked for the material warrant, I had a conversation with Mr. Brooks, and I don't have the record site, but I believe it's in the record that I indicated that he believed what he wrote at the time was true. The reason he's hesitant, I don't think it's because of lack of memory. I think it's because he's out of fear. But the fact of the matter is ñ Well, I mean, what would happen if we had to send it back for a hearing, and he says, yeah, that's my signature, but I was drunk when I wrote it, and I don't know what I saw? We don't know what he's going to say. Well, that's part of the problem with your motion. I mean, before we get to whether it would have made a difference, we would have to make a threshold finding that you could get it in as past recollection recorded. One of the elements of that is that he would say it was, I don't remember it now, but I can tell you it was true when I perceived it, and that's my signature, and, you know, that's the way you'd have to proceed. That's a missing link in the chain that I see. Well, it's a missing link, but we were unable to even bring Mr. or Samuel Brooks in for that purpose, Your Honor. Well, I mean, to support your motion for new trials, shouldn't you have had something from Mr. Brooks saying, hey, look, if you ask me, I'll tell you I don't remember it, but I can satisfy all these other things to get it in. That seems to be missing from your motion for new trial. Well, I suppose what I believe is there that's in the record, Your Honor, is that he said that everything was true and correct under the penalty of perjury. He said that to you? He said that. No, it's a written statement. It's a statement under the penalty of perjury. You mean his original statement? Yes. Yes. No, I'm talking about whether he would now, in support for your motion for new trials, say, yes, when I wrote it, I knew that to be true, I wasn't drunk, I wasn't under pressure, you know. I don't have that. You've already answered my question. You said you don't have that. No, I don't have that. Okay. Let me ask you another question, as long as I have the floor for a second. The judge said the judge denied your request for a shoe size expert because he said you had plenty of information earlier on to get a shoe size expert. I know they gave you some new pictures, but he said the pictures they had already given you were ample for you to know that you could have figured out what the proper shoe size was. What's your answer to that? Well, the judge did his own comparison, Your Honor, and I'm not saying that when you look at the photos they don't look like good comparisons, but the fact of the matter is the material that we received from the FBI lab were the natural size photographs that the lab actually took under laboratory conditions. The other photographs that the judge reviewed were photographs that were taken at the scene and not under laboratory conditions. Yeah, but his point is since it had a ruler, you could have figured out what the size of the shoe in the picture was and turned that over to an expert. That may be true, Your Honor, but that's not the only issue in that report from the FBI. The other issue that was presented to the district court was the fact that that report that we're relying on, which I believe was May 5th of 2006 or 2007, that lab report indicated that there was additional descriptive information of the shoe attached to that report, and we have yet to receive any additional descriptive information in relation to that shoe that we believe exists. Yeah, that may be, but his point was you could have figured out, you had everything you needed to know to hire a shoe size expert is the point. We didn't have that descriptive information, which could have had the shoe size on it. We still don't know what that is. So my point to the court was this, Your Honor, was that, yeah, we could have explored an expert sooner, but we did get information from the government in relationship to the shoe that we wanted to explore further, and that's why I asked for leave to file for an expert. And this was approximately two and a half months before the trial would have taken place when this request was made. Thank you. You answered my question. Thank you. You're out of time, but I'll give you two minutes for rebuttal, but thank you very much. Ms. Bolton. Good morning. Jill Bolton for the United States. A couple of points of clarification. This case did proceed to jury trial, and it took about two weeks to finish. There was what seems to be missing, I think, in the discussion that's taking place today regarding the evidence that was presented at trial is what Judge Whaley, when he listened to the evidence, had direct access to and what the jury had direct access to, and that is very detailed descriptions of the evidence, the crime scene, and the DNA evidence. If the court recalls from the opening brief presented by the defendant on appeal, the discussion takes place very similar to a closing argument. He talks about all of the evidence that he submits, had the jury believed, would have resulted in an acquittal. However, the standard of review on appeal is, of course, looking at the evidence in the light most favorable to the government, and that's what the jury found, and the jury found the defendant guilty, and that's based on ample evidence that the defendant committed this murder. As indicated in the factual scenario set forth in the supplemental excerpts of record, as well as the excerpts supplied by the defendant, and I believe he pretty much laid out the entire record for the court in his excerpts, the defendant showed up on the victim, Lillian Lee's, doorstep in the early morning hours of March 18th of 2006. It was winter, and a lot of these factors come into play as you go through the evidence and what was actually found at the crime scene. He showed up. He had a big coat on and pants, and I think there's a reference just to exemplify, in essence, what's missing from the defendant's argument here. The defendant, the defense points out, he wasn't wearing a tank top. Well, it was March of 2006, and there was a heavy overcoat, and the black tank top that was found in the bag of clothes was probably underneath that coat. But regardless, there were actually three individuals that were with the victim that brought her back from a trip to Yakima, and they had returned very early in the morning. They dropped her off, and the defendant was there on her doorstep. The parties all came in together, the victim's daughter and the victim's nephew, and there was another woman that was out in the car. Her name was Anita Frank, I believe. And they all had a short conversation, and it was decided that the defendant was going to spend the night with the victim. That was all testimony that was adduced at the trial. So the last, and what should be noted, is that the victim's daughter came back periodically to check on her mother over the course of that weekend and even left a note for her because she couldn't find her, and there was no response at her door. That was all evidence that was in front of the jury that showed that here's people coming, trying to find her over the weekend from the last time she saw her mother alive in the company of the defendant and the time that her mother was found dead. So there's those people that, first of all, placed the defendant at the crime scene the last time she was seen alive. And then you have the actual crime scene evidence. You have the victim's body, which is replete with evidence of a very violent, homicidal encounter. There's a knife in the kitchen sink with hair on it, and the defense points out that there was no confirmation of blood. Well, what the DNA analyst explained is that when you examine DNA, and if you don't have a large sample, then you skip the serological examination. You don't find out if it's semen or blood or skin. You just test for the DNA, because it takes a certain amount of DNA in order to run those tests. And that's what happened with the kitchen knife. Now, to the naked eye and the pictures that were shown to the jury, it looked like this was a bloodied knife. The DNA testing showed that the DNA on that knife was the victim's. A reasonable inference from that evidence for the jury to conclude, combined with the 30 slashes on the victim's body to her face, to her hands, to her stomach, to her backside, to her legs, all corroborate what that crime scene showed. And then what else was there at the crime scene? There was a condom wrapper that was torn apart. Part of that condom wrapper was underneath the victim's body. Some of the photographs shown to the jury were that the body was moved after the coroner came, after the FBI did all of their photographs. And the blood had seeped out around the condom wrapper and left a blank, unsullied area where that condom was under her body. And so a reasonable inference is that whoever put that condom there and had whatever sexual encounter that condom might imply, had this bloody encounter with the victim and her body landed on top of that condom wrapper and she bled over the top of it. Now, a second piece of that condom wrapper was by her body and then there was the used condom in the sink of the victim's bathroom with the defendant's semen in it. Also on the victim's body, a sweatshirt. And as the DNA analyst explained, the FBI analyst explained at trial, when you have a large blood stain on a victim's body, you don't bother testing to know whether or not that's blood. It's quite obvious. You don't waste resources doing that. It's quite obvious. And she's cut all over her body. So the blood that has soaked into that sweatshirt is blood. A cutting from the sleeve of the sweatshirt was taken. And as the analyst described, it was almost like winning the lottery when they managed to get a DNA sample that had both a combination of the victim's and the defendant's DNA on it. And when they tested that, what they determined, and the defense tried to make a big deal about the fact that there was no confirmation that the DNA was the defendant's. But the way the FBI laboratory and the DNA analysts explain DNA testing is quite different than what seems obvious. So the way it goes is when they find a DNA sample and then they have a known contributor that they're comparing that sample to, what they do is they say, okay, can this sample, can this person's DNA profile be eliminated as a potential contributor? And so the terminology they use is they cannot be excluded as a potential contributor, which means that DNA sample cannot be excluded as the same one that we have as a known sample. And so they look at that as a statistical probability based on known samples, whether or not that DNA in fact correlates to the DNA of the defendant. And what's the likelihood that they got it wrong? That's somebody besides the defendant. And so the way that that resolves and the way the jury found it is that the DNA on that sweatshirt, the combination was the victim's DNA, very likely from her own blood, and the defendant's DNA. The evidence seems to confirm that the defendant had sexual relations with the victim. But what is the strongest evidence that he actually killed her? And was there ever any evidence of a motive for why he would do that when he was described as a family friend? Well, unfortunately, the evidence motive was in the defendant's own explanation, which was his confession, which was not admitted in front of the jury. It's hard to imagine an encounter such as that that occurred on the evening or sometime between March 18th and March 20th, 2006, or what would motivate an individual other than some kind of a blind rage or violent outburst. Did he have a history of violence? The evidence showed a history of substance abuse primarily. That information did not come in front of the jury. So the jury was left with the actual crime scene evidence. And what's notable, I think, is that there was a long period of time where, because of the relationship between the defendant and the victim, he was considered like a son to her, which, again, maybe that raises the issue of what's the motive? Why is there a sexual encounter between these two individuals? How did that happen in light of the relationship that they did have prior to that date? But the information that did come out about that, based on that, there was a lengthy investigation into potential other suspects. There were about 12 other individuals whose DNA was obtained, and they were reviewed and compared to all of the DNA that was found at the crime scene. And everyone else, every other potential suspect that was identified by law enforcement in that very small community in Nespilam, Washington, which is on the Colville Indian Reservation, was excluded. Were they excluded based only on those items of evidence that we've been talking about, or were there other items of evidence that were tested that were not pertinent to this defendant's case?  Eventually, the defendant's known profile was compared against. Once he became a verified suspect, once they ran the semen through the CODIS database, and they confirmed that, yes, that was him. Was Mr. Jolly excluded at that time, too? Yes. Yes, he was. And with regard to Mr. Jolly and getting on that issue with the Brooks statement and Mr. Jolly, what also is missing from the discussion, I think, in front of the Court today is that Mr. Brooks was well known. And the Court, I believe, heard testimony at one of the pretrial hearings on this issue, or at least a representation from the government based on the information from the FBI. But this particular individual had a very, and by this individual I mean Mr. Brooks, had a very lengthy criminal history. And so his credibility was highly suspect. So you had that on top of the issue that he didn't even remember having made the statement. And then the context in which this was raised, I think, which is a crucial consideration for this Court, is that the defendant raises this in the context of a motion for a new trial based on new evidence. And what the government submits is that this isn't even newly discovered evidence. This is evidence that was available at trial. It was actually admitted at trial in a limited context. How was it available substantively? I don't understand how it was available substantively. Well, it wasn't. Well, the truth of the statement was not made available to the jury. And that's because the declarant was unavailable. Well, the purpose of the offer of the evidence by the defense at trial was to impeach law enforcement. Well, that's what they had to settle for. They wanted to get it in substantively. They couldn't do it because the declarant was unavailable despite their efforts to find him. Isn't that true? Mr. Brooks? Yes. The declarant. Well, he was, as far as we know, that was the effort that was undertaken. They tried to obtain him. They got a material witness warrant. And he showed up after trial. So the short answer to my question was he was unavailable. And then after the trial became available. That's the claim. Yes. Well, that's also the truth, isn't it? That's what the evidence shows. Yes, before this court. That's correct. What they said is that he's, I think there's multiple layers here, just like the hearsay in the statement itself. They said that he wasn't available prior to trial. But even if he were available, I guess that's where I come back to, is that somehow, would that have changed anything? Would the statement have been admissible? That's the question I have. Assuming, let's leave aside whether it's newly discovered. Let's leave aside the hearsay issues. Brooks would have testified or would have affirmed his previous statement that he saw somebody outside the crime scene with blood and ruminating about, you know, life being messed up and so forth. Wouldn't that have been admissible and probative? You don't see that, I mean, and his knuckles were swollen. Wouldn't that have been a good point for Mr. Seidemann? I think it would have been if he could have introduced that witness and the witness would have said what he put in the statement. What the witness would have happened in front of the jury, though based on what we know about this particular witness and this particular statement, is that either Mr. Brooks would have shown up and said, oh, I was drunk or I don't know what I wrote there and that wasn't me. Or he would have said, yeah, I said that and I think that's right. And then he would have been impeached based on, first of all, any ability to recall the time or date that the statement was made or these observations were made, based on all of the credibility issues that came with him. And I think that's really the underscoring issue here is that this particular witness was by no means credible. He threw out a statement to try to implicate someone he had a beef with, and I don't think it would have been admitted. I think that the court would have said, no, this doesn't come in because this lacks any indicia of reliability, even if it's coming from the declarant. But in truth, you have the other layer, which is the declarant isn't Mr. Brooks. It's Jolly. And if the defense— Well, part of it is Jolly. Part of it is Jolly. Part of it is Brooks. Brooks said, I saw Jolly with blood outside the crime scene with his hands swollen. Brooks is the declarant on that. Right. That's pretty probative. And that would not be hearsay. That would be his observation. True, right, his observations would have been probative. So I guess if you take it to the next level and you say, okay, where does that fit in to the crime scene evidence? Well, Mr. Jolly didn't show up on any of the DNA. Mr. Jolly's clothes weren't found out behind the house. And that makes me move into, if it's okay with the court, the issue of these clothes, because I think there's been a lot of attempts at confusing the issues here. And what I did when I supplied the supplemental excerpts of record to the court is I attached the actual crime scene photographs. And they're at the supplemental excerpts at pages 48 through 53. And what that shows the court is that, okay, you have the Colville Tribal Police who are at the crime scene. They retrieved this evidence. The photographs don't show that, but that's what the evidence bore out at the trial. And there was testimony by both the Colville Tribal Police and then the subsequent FBI analysts who inventoried the items and gave the descriptive data that there's been much attempted confusion of the record about. But what came out at trial from the DNA analysts, and I think is important, is that when they conduct DNA testing, they focus on the most intimate object. So the object that's going to have the closest proximity to the victim and or the suspect. So in this case, that was the underwear, which at page 50, you can kind of see it's a greenish color underwear. Was the underwear always in the inventory? That's my problem, is that the underwear is not inventoried or listed in the November 2006 inventory. Right. Well, as the DNA analyst explained in her testimony, when the items are collected by a police agency and then they go to the FBI office and they get logged in as an item. Now, these were all grouped as one item, clothing, and that's it. So when they came to the laboratory at the FBI, that's how they were viewed, is clothing. When a particular item is taken out, that's written down on the inventory as having been examined. But that doesn't mean that the other group wasn't all part of the same group of evidence, which was this group of clothes, jeans, belt, belt buckle, underwear, sock, tank top. So initially, when the bag of clothing was found, the specific items within the bag were not individually inventoried? That's correct. It was just called bag of clothing? Yes, and that's how it went to the FBI. And then the FBI tested the underwear and also took out the belt and made the measurements, which was also admitted at the trial and shows this Rock-A-Wear belt. And evidence was introduced that explained how this belt belonged to the defendant. That link was also made. Sorry, before your time is over, I want to ask you about the shoe expert and what's your response to there not being a shoe expert allowed for the defense? I'm not aware of any disallowance of that opportunity. The judge gave, and there were 22 months from the time the defendant had access to the government's evidence and the deadline on the pretrial motions and the notices of expert, and that's where Judge Whaley drew the line and we had this discussion, well, did you have access to this shoe size expert or not? And what the evidence showed at that discussion and that hearing with Judge Whaley was that, in fact, the defense had the photograph of the shoe prints, had the measurements of the shoe prints, had every opportunity to obtain a shoe size expert. It was strategic. They had hoped that we would pull in a shoe size expert. What about this descriptive reference that there was supposed to be some sort of descriptive report regarding the shoes? I think, as Judge Whaley's rulings described on that issue, there was nothing different about that. There was a description, and there are reports that actually relate to that description, and I believe it was a Nike air trainer shoe's tread pattern was what was determined, and that was in the reports that were supplied to the defendants. So that is the descriptive information of the tread pattern that was provided. How about the potential, I guess, prosecutorial misconduct here regarding the objection that the defense made to the belt and the comment that the prosecutor made? I don't know if that was you or not. Sure, that was me. That the reason they were trying to object was they didn't want that to come in. I mean, was that proper? I think it's entirely proper. When you try a case, there's a lot of events that occur in front of a jury, including a defendant's observations that the jury can make of what a defendant does or doesn't do, how they behave during a courtroom proceeding. All of that is evidence as far as the government is concerned. And when you get your closing argument, in this case it was a rebuttal closing argument, the defendant had brought up this issue of this underwear must be the victim's, and there's no evidence that ties that to Mr. Seidemann. But what the jury knew and saw throughout the trial was that the government built the case of this evidence, circumstantial as it may be, but the defendant's DNA, the victim's DNA are on this underwear, and that belt and that buckle, those genes, those all relate to him. Even his uncle, who we called and didn't want to testify, it was quite clear to the jury, admitted that, yeah, those are what the defendant would wear, and I never saw them again after the victim died. So that was all part of what transpired in front of the jury was this argument that these clothes aren't his. And so what I explained to the jury is, well, if they weren't his, then why did he argue so hard to not let them come into evidence for you to see? I tell you, I think you're absolutely wrong if you were going to tell us that you think that you can argue to the jury that objections, especially if they're well taken, can be used as substantive evidence against the defendant. I sure don't buy that. Well, Your Honor, I don't submit that there's substantive evidence. I submit that they're argument, and that's what it was. It's argument. It's an attempt to persuade the jury how to fit together all of those pieces of what transpired. And you think you can argue that they can draw inferences against the defendant because of objections that the lawyer makes? Is that what you're telling us? No, and I think that the judge, when he instructs the jury, makes that real plain to them and makes that very clear, and that's what we can rely on, is that the jury was instructed that what we say, what objections are made, what arguments are made. Do you think you can say anything to the jury because of that instruction that the judge gives? Well, there are obviously limitations that would exist. Yeah, and isn't one of the limitations that you can't argue to the jury X, Y, or Z inference because of an objection the lawyer made? The lawyer's objections are not evidence, and you can't argue them. Isn't that right? That's not what the instruction is given to the jury. I'm not sure if that's what the court's asking me. No, that's not what I'm asking you. Do you think you have the right to argue to the jury that you can infer fact A, B, or C because the lawyer made an objection to evidence? Of course not. Now, let me ask you another thing related to that. When the objection was made, when the closing argument was made, there was no objection to it. Is that right? That's correct. Okay, so this would be a plain error kind of thing. That would be the standard of a yes, Your Honor. Thank you. Do you have anything more? May I ask one more question? I know that she's out of time. But I realize that Mr. Jolly's failure of the polygraph test was not admitted into evidence, but was he further investigated after failing to pass the polygraph, or did the investigation of him end because of the confession of the defendant? The polygraph examination was ‑‑ I'm trying to follow the sequence. One of the claims here is that the judge did not allow Mr. Jolly's failed polygraph evidence into the trial. And I believe the evidence may be, and I'm not clear on this, is that that never was discussed about whether Mr. Jolly was pursued as a possible suspect because I believe the FBI stopped investigating after the defendant confessed. Is that the correct sequence? I don't think that's the correct sequence, Your Honor. I believe that the investigation went on for several years after the death, and Mr. Jolly's polygraph examination was during that investigation. It did continue after that polygraph examination, and I believe it continued after the confession, but I think that's correct. Okay, but none of that evidence came before the jury, correct? The polygraph examination? No, what efforts were undertaken to investigate Mr. Jolly? Just simply in the context of the DNA, because his DNA was submitted as a known sample, and he was not determined to have DNA on any of the items of evidence that were tested. That is correct. All right, thank you. Thank you. Thank you. Thank you. Mr. Hormel? Hormel, yes. You have two minutes. I just want to correct the record for you, Your Honor, and that is at page 1571 of the excerpt of record. The ECU unit, or the Evidence Control Unit of the FBI, did list the underwear as Q63 in the initial inventory of the contents of the bag. What they didn't list was a belt. In fact, the note said that the bag lists a belt as being included in the sealed bag, and then it says later they opened the bag to verify its contents and unable to verify contents in ECU. So that note basically indicates that there was no belt that they could verify in the ECU unit. So the April 18th, excuse me, at 1559, is the handwritten update of the evidence log of November 15th, 2006, and it does list the underwear under Q63, but then it includes in handwriting a belt, a black tank top, a sock, and a rag. So that was the main thrust of the chain of evidence issue, is because there's nothing to indicate what happened to the contents of that bag after it was seized by the law enforcement. I believe that, in further evidence of the chain of evidence objection, is that the supplemental excerpt of record that counsel referred to shows at page 52 what appears to be a belt and a belt buckle in and near the bag that was retrieved in the pasture, and then 53 shows what appears to be a belt and belt buckle that has been cleaned up. So if you look at the picture on page 52 of the excerpt of record and compare it to the picture of page 53, it appears that something has happened to the belt buckle, which is why I cited the Dickerson's case. And if the evidence appears to have been changed or somehow manipulated, that there is a strong chain of evidence issue, and the government has to prove that they took extra special precautions to avoid any tampering with evidence, that wasn't done in this case. Thank you. Thank you. Thank you. The case of U.S. v. Ryan Seidman will be submitted. Thank you both for your arguments here today. We're ready to proceed to the next case, and that is the case of
judges: Gee, Silverman, Murguia